David Loy, Cal. Bar No. 229235
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901
Telephone: (415) 460-5060
Email: dloy@firstamendmentcoalition.org

Zachary T. Silver, D.C. Bar No. 1742271*
Gabriel Z. Walters, D.C. Bar No. 1019272*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473
Email: zach.silver@fire.org
Email: gabe.walters@fire.org

*Attorneys for Plaintiff*
* Pro hac vice *applications forthcoming*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| STACEY SEGARRA-BOHLINGER,<br>Plaintiff,<br>v.<br>CITY OF LOS ANGELES, a political subdivision of the State of California,<br>Defendant. | Civil Case No. _______<br><br>**VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS** |

## INTRODUCTION

1. This case is about whether the First Amendment allows a city government to dictate which words citizens may use when criticizing the city during the public-comment portion of government meetings. It does not.

2. That is because the First Amendment protects not only the ideas a speaker wishes to express but also the words the speaker chooses to express those ideas. "[O]ne man's vulgarity is another's lyric," the Supreme Court has explained, and "it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Cohen v. California*, 403 U.S. 15, 25 (1971). One's "viewpoint covers more than an individual's particular thoughts and ideas on a given topic; it also covers his decision on 'how best to speak' and express those ideas." *Utah Pol. Watch, Inc. v. Musselman*, 179 F.4th 1241, 1263 (10th Cir. 2026) (Tymkovich, J., concurring) (quoting *Chiles v. Salazar*, 607 U.S. 627, 640 (2026)).

3. Allowing the government to prohibit particular words creates a "substantial risk of suppressing ideas in the process," as officials can "seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Cohen*, 403 U.S. at 26. That danger is especially acute during public-comment periods at city council meetings.

4. "Citizens have an enormous first amendment interest in directing speech about public issues to those who govern their city." *White v. City of Norwalk*, 900 F.2d 1421, 1425 & n.3 (9th Cir. 1990). To ensure the government does not weaponize decorum rules to silence speech it finds objectionable, the First Amendment requires a speaker "actually to disturb a meeting" before the government may silence or remove a speaker from a public meeting. *Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) (en banc). "Actual disruption means actual disruption," and the government "cannot define disruption so as to include non-disruption." *Id.*

5. The City of Los Angeles (the "City") has run afoul of those constitutional limits before. In 2013, a federal court held the City violated the First Amendment when its City Council removed critics merely for using

profanity. *Dowd v. City of Los Angeles*, No CV 09-06731 DDP (SSx), 2013 WL 4039043, at *17–21 (C.D. Cal. Aug. 7, 2013). Yet the Los Angeles City Council (the "Council") now maintains and enforces a rule categorically prohibiting members of the public from using certain words during the public-comment period of Council and committee meetings: "cunt," "nigger," and "any variation of either of these words" (the "Word Ban"). The Word Ban applies regardless of how a speaker uses the word or whether their speech actually disrupts a meeting.

6. And if a previously warned speaker repeats a prohibited word, the presiding officer must stop the meeting, reissue the order not to use the word, declare that the need to do so "has actually disrupted the meeting," and cut off the speaker's remaining time. The Word Ban thus manufactures the disruption it purports to punish. The presiding officer then has discretion to remove the speaker from the meeting, without any standards governing the exercise of that discretion.

7. The Los Angeles City Council's censorship doesn't stop there. Once a person is removed from a Council or committee meeting, a second rule, the "Meeting Ban," automatically bars that person from attending future meetings for a prescribed period.

8. The Council has weaponized the Word Ban and Meeting Ban to silence, remove, and prospectively exclude its critics, including Plaintiff Stacey Segarra-Bohlinger. During two Council meetings, while criticizing the Council and its Word Ban during the public-comment periods, Segarra-Bohlinger said the word "cunt" as part of her critique of the policy encompassing it. Both times, she stayed within her allotted speaking time, spoke about issues within the Council's jurisdiction, promptly yielded the podium when her time expired, violated no other meeting rule, and caused no disruption. Yet the Council twice

threatened to remove her if she said the word again and, when she repeated it at the second meeting, ordered her to leave.

9. That removal automatically triggered the Meeting Ban, barring Segarra-Bohlinger from future Council and committee meetings—not because she actually disrupted a prior meeting (or a future meeting she had yet to attend, much less disrupt), but because she uttered a “forbidden” word.

10. The Council’s enforcement of the rules against Segarra-Bohlinger violates the First Amendment and California’s Ralph M. Brown Act, which protects public attendance and participation at Council and committee meetings and prohibits removal absent actual disruption. Neither the Constitution nor California law permits the Council to decide which words citizens may use at public meetings and punish noncompliance with removal and restraints on future expression.

11. Yet the Word Ban and Meeting Ban remain and continue to be enforced, requiring speakers like Segarra-Bohlinger to censor themselves during public-comment periods and suffer removal and exclusion from public meetings if they express their views using words the Council doesn’t like.

12. Meanwhile, the Council President has made clear the Word Ban is only the beginning, explaining he expects the Council “to take additional steps in the future” to prohibit additional language the Council finds offensive.

13. Segarra-Bohlinger brings this lawsuit to protect her right—and the right of all Angelenos—to decide for themselves what to say to their government, and how to say it.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

14. This action arises under the First and Fourteenth Amendments to the United States Constitution and the Ralph M. Brown Act, Cal. Gov’t Code §§ 54950–54963. Segarra-Bohlinger brings this action under the Civil Rights

Act of 1871, 42 U.S.C. § 1983 and 1988; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the Brown Act, Cal. Gov't Code § 54960(a).

15. Segarra-Bohlinger seeks declaratory relief that the Word Ban and Meeting Ban violate the First Amendment and Brown Act on their face and as applied to her, an injunction prohibiting the Los Angeles City Council from enforcing the Word Ban and Meeting Ban, nominal damages against the Council for violating her First Amendment rights, and attorney's fees and costs.

16. Accordingly, this Court has original jurisdiction over Segarra-Bohlinger's First Amendment claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a) (civil rights jurisdiction).

17. The Court also has supplemental jurisdiction over Segarra-Bohlinger's Brown Act claims under 28 U.S.C. § 1367(a).

18. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(1) because the Defendant resides in this District, and under § 1392(b)(2) because a substantial part of the events and omissions giving rise to Segarra-Bohlinger's claims occurred within this District.

19. Assignment to the Western Division is appropriate under Local Rule 83-1.1 and General Order 26-11, § I.B.1.a(1)(C), because no parties reside in the Southern or Eastern Divisions.

## THE PARTIES

### Plaintiff

20. Plaintiff Stacey Segarra-Bohlinger has been a resident of Los Angeles, California, since 2016 and is active in local civic life. From 2021 to 2025, Segarra-Bohlinger was an elected member and secretary of the Sherman Oaks Neighborhood Council; she continued to serve on two of the Neighborhood Council's committees until August 2026. Segarra-Bohlinger often attends meetings of the Los Angeles City Council and its committees,

where she frequently criticizes the actions of those bodies and their members during public-comment periods.

21. The City of Los Angeles violated Segarra-Bohlinger's rights under the First Amendment and California's Ralph M. Brown Act when its Council threatened to remove Segarra-Bohlinger from a meeting for saying the word "cunt" during her public-comment remarks criticizing the Council and its Word Ban encompassing that word.

22. The City again violated Segarra-Bohlinger's rights under the First Amendment and Brown Act when the Council threatened to remove her from a second meeting for saying the word "cunt" during her public-comment remarks criticizing the Council and its Word Ban; and again when the Council ordered Segarra-Bohlinger to leave that meeting and barred her from attending future Council and committee meetings for repeating the word.

**Defendant**

23. Defendant City of Los Angeles is a municipal corporation organized under the laws of the State of California. *See* L.A., Cal., Charter § 100. With nearly 4 million residents, Los Angeles is the most populous city in California and the second most populous city in the United States. *See* U.S. Census Bureau, *City and Town Population Totals: 2020–2025*, https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-cities-and-towns.html (last revised May 26, 2026).

24. The City of Los Angeles violated the First Amendment and Brown Act by establishing, maintaining, and enforcing the Word Ban and Meeting Ban.

25. The City of Los Angeles violated Segarra-Bohlinger's rights under the First Amendment and Brown Act by threatening to remove Segarra-Bohlinger from two Council meetings, actually removing her from a Council meeting, excluding her from future Council and committee meetings, and

holding the Word Ban over her head going forward—all for her non-disruptive, constitutionally protected public-comment remarks criticizing the Council and its Word Ban.

## FACTUAL ALLEGATIONS

**Los Angeles City Council meetings are open to public participation.**

26. The Los Angeles City Council wields "[a]ll legislative power of the City." L.A., Cal., Charter § 240.

27. The Council also has "the exclusive power to organize its business, prescribe the rules of its proceedings and preserve order at its meetings," subject to certain requirements specified in the City's Charter. *Id.* § 242.

28. The Council's rules for its proceedings are compiled in the Rules of the Los Angeles City Council (the "Council Rules").

29. The Council Rules are publicly available on the City of Los Angeles's website: https://clerk.lacity.gov/sites/g/files/wph1491/files/2021-02/lacityp_026042.pdf.

30. The Council Rules implement the Charter's requirements for Council proceedings.

31. Pursuant to the Charter § 242(a), the Council holds three regular meetings each week and special meetings as needed. *See* Council Rule 18.

32. Under sections 243(a) and (b) of the Charter, the President of the Council presides over all Council meetings, with the President Pro Tempore presiding over a meeting in the President's absence. *See* Council Rules 1–2.

33. The Council Rules also implement the Ralph M. Brown Act, Cal. Gov't Code §§ 54950–54963.

34. The Brown Act guarantees the public's right to attend and participate in meetings of local legislative bodies by imposing requirements on those bodies' proceedings. *See id.* § 54953(a).

35. In particular, the Brown Act states, "All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter." *Id.*

36. The Los Angeles City Council is a legislative body of a local agency covered by the Brown Act, as is each of its committees.

37. Under the Brown Act, every regular meeting of a legislative body of a local agency must provide an opportunity for public comment on any issue within the body's subject matter jurisdiction as well as on specific agenda items. *See id.* § 54954.3(a)(1).

38. The Brown Act also guarantees the right to give public comment on matters identified in the notice for a special meeting of a legislative body. *See id.* § 54954.3(a)(3).

39. To that end, in Los Angeles, every regular meeting of the Council and its committees provides an opportunity for members of the public to address the Council or committee "on any issue within the subject matter jurisdiction of" that body, and every regular and special meeting of the Council and its committees provides an opportunity for members of the public to speak about agenda items. Council Rules 7, 62–63.

40. The Council also adopts its own rules to govern its meetings.

41. For example, the Council Rules require speakers participating in public-comment periods to remain on topic and to promptly end their remarks when their time expires. Council Rule 11.

42. Public speakers who violate Council Rules are subject to removal if, after receiving a warning, they "continue to violate the Rules and disrupt the meeting." Council Rule 12.

43. The Council or a committee may, by a majority vote, overrule a presiding officer's order to leave the meeting. *Id.*

44. The Council's Sergeant-at-Arms may remove a person who "does not timely leave the meeting" after the presiding officer orders them to do so. *Id.*

45. If that person "willfully resists, delays or obstructs removal by the Sergeant-at-Arms," they are "subject to arrest for violation of the Penal Code or Los Angeles Municipal Code." *Id.*

**The Council adopts the Word Ban and Meeting Ban.**

46. The Council's rules governing public comment have previously been the subject of First Amendment litigation. In *Dowd v. City of Los Angeles*, the Council invoked a rule prohibiting "personal, impertinent, unduly repetitive, slanderous or profane remarks" to remove Matthew Dowd and David "Zuma Dogg" Saltsburg for using profanity while criticizing City officials and policies. 2013 WL 4039043, at *17–21. The district court held those removals violated the First Amendment because there was "no actual disturbance beyond breaching the Rules by the use of profanity." *Id.* at *19–21.

47. The court explained that Councilmembers should expect to encounter "offensive language and swear-words" and "personal attacks in such language," and that tolerating such speech "is what is required by the First Amendment." *Id.* at *21. Thus, while the Council "has a right to keep its meetings on topic and moving forward, it cannot sacrifice political speech to a formula of civility." *Id.*

48. When Marqueece Harris-Dawson became Council President in September 2024, he made eliminating offensive language from public comment one of his priorities and announced plans to return to court over the issue.

49. During an interview with *Los Angeles Public Press* on September 16, 2024, Harris-Dawson explained he wanted to "remove a lot of the riff-raff"—that is, members of the public who use language he considers "vile, racist,

homophobic, sexist, [and] antisemitic" during public-comment periods. Elizabeth Chou, *Interview: Marqueece Harris-Dawson's Vision for LA City Hall*, L.A. Pub. Press (Sept. 25, 2024, 11:35 AM), https://lapublicpress.org/2024/09/marqueece-harris-dawson-interview-council-president.

50. He promised, "Between me and the city attorney and the council, we will do something." *Id.*

51. Four days later, during the press conference following his installation as Council President, Harris-Dawson promised he was "already working closely with the City Attorney to go back to the court to see if we can get some relief" from the Council's obligation to allow what he viewed as "racist," "misogynistic," and "anti-Semitic" speech during public-comment periods. LACityView35, *Council President Marqueece Harris-Dawson Swearing In Ceremony Press Conference 9/20/24*, at 31:16 (YouTube, Sept. 20, 2024), https://www.youtube.com/watch?v=xLM2Ku8fd_E.

52. Six months later, in March 2025, Harris-Dawson introduced a proposal to prohibit all utterances of the words "cunt," "nigger," or any "variation" of either word at Council and committee meetings (the "Word Ban").

53. Before introducing the Word Ban, Harris-Dawson told a reporter he designed it to restrict language certain groups find offensive. *See* John Regardie, *Exclusive: Council President Set to Target Vile Slurs in City Hall*, Westside Current (Mar. 20, 2025), https://www.westsidecurrent.com/news/exclusive-council-president-set-to-target-vile-slurs-in-city-hall/article_37fadc73-8811-4959-87e1-0baedcc2c310.html.

54. When asked "if he considers [the Word Ban] a case of baby steps, starting with two offensive words, and then building," Harris-Dawson

responded: "Absolutely. Absolutely. This is as much a step as we can take at this moment, we believe. But we think it will open us up to take additional steps in the future." *Id.*

55. The Council approved the Word Ban on July 31, 2025, and incorporated it into the Council Rules.

56. A true and correct copy of the Word Ban, as codified in the Council Rules publicly available online, is attached as **Exhibit A**.

57. Under the Word Ban, a speaker who uses a prohibited word receives a warning. If the speaker again uses a prohibited word "in that or any future Council or Committee meeting," the presiding officer must stop the meeting, "re-issue the order" not to use a prohibited word, state that the "need to re-issue the order has actually disrupted the meeting," and "cut off the speaker's time to speak for the remainder of that meeting." The Word Ban also gives the presiding officer discretion to remove the speaker from the meeting.

58. Before the Council adopted the Word Ban, the Brown Act and Council Rules already allowed presiding officers to eject members of the public whose conduct actually caused disruption to a Council or committee meeting. *See, e.g.*, Cal. Gov't Code § 54957.95(a); Council Rule 12.

59. The Council's stated reason for adopting the Word Ban, conversely, is that it believes the prohibited words too "offensive" to ever be "necessary to convey [a speaker's] viewpoints," and a speaker who uses a prohibited word does so only "for the sake of offense and injury itself." Motion, Council File No. 16-1104-S3 (L.A., Cal., Mar. 21, 2025), https://cityclerk.lacity.org/onlinedocs/2016/16-1104-S3_misc_03-21-25.pdf.

60. At the same time he was pressing the Council to adopt the Word Ban, Harris-Dawson introduced a proposal to "increase the consequences" for anyone removed from a Council or committee meeting.

61. Under that proposal, a person removed from a meeting for disruption is automatically prohibited from attending all Council and committee meetings for the remainder of that day and the following meeting day. Further removals within specified periods trigger escalating exclusions of up to six meeting days (the "Meeting Ban").

62. The Council approved the Meeting Ban on October 14, 2025, and incorporated it into the Council Rules.

63. A true and correct copy of the Meeting Ban, as codified in the Council Rules publicly available online, is attached as **Exhibit B**.

**The Council enforces the Word Ban against Segarra-Bohlinger.**

64. The Council has repeatedly enforced the Word Ban against public speakers who have used the prohibited words while criticizing City officials and policies, including the Word Ban, even when the speaker did not violate any other Council Rules and did not disrupt the meeting.

65. The Council has also repeatedly enforced the Meeting Ban against speakers removed from meetings for repeating a prohibited word after a warning, even when the speaker did not violate any other Council Rules and did not disrupt the meeting.

66. Stacey Segarra-Bohlinger is one such speaker. She is a frequent attendee at Council and committee meetings. During public-comment periods, she often criticizes City officials and policies by singing parodies of well-known songs with lyrics altered to cover topics within the Council's subject matter jurisdiction.

67. The City Council held a regular meeting on October 31, 2025.

68. Video of the regular Council meeting on October 31, 2025, is publicly available on the City Clerk's YouTube channel. LACityClerk, *Regular City Council – 10/31/25* (YouTube, Oct. 31, 2025), https://www.youtube.com/watch?v=djwZFbCZlA0.

69. While addressing the Council during the public-comment period, Segarra-Bohlinger criticized the Council for adopting the Word Ban with a parody of the *Ghostbusters* theme song.

70. The lyrics to Segarra-Bohlinger's parody read in full:

> The NSSE enables ICE raids
> So Council votes to approve police overtime
> Demonstrators are being brutalized
> What does Council do? Fund police overtime
>
> LAPD is afraid of the press
> LAPD is afraid of the press
>
> While people are displaced from their neighborhoods
> What does Council do? Ban bad words
> So many issues and none of them good
> What does Council do? Ban bad words
>
> Council is afraid of the word "cunt"
> Council is afraid of the word "cunt"
> Council is afraid of the word "cunt"
> Council is afraid of the word "cunt"

*Id.* at 02:04:24–05:15.

71. As Segarra-Bohlinger used the term, "NSSE" is an abbreviation for "National Special Security Event."

72. Segarra-Bohlinger then said, "Kind of insane how you're more offended by bad words than police brutalizing citizens and journalists in the streets. Fuck ICE. And shout out Smoke N' Scan."[1] *Id.* at 02:05:16–25.

73. After concluding her remarks within the time allotted, Segarra-Bohlinger promptly left the podium.

---

[1] Smoke N' Scan is a livestreaming platform that regularly broadcasts and comments on Council meetings and other events in Los Angeles. Public commenters at Council meetings frequently acknowledge or "shout out" Smoke N. Scan during their remarks.

74. Segarra-Bohlinger's remarks did not violate any Council Rule other than the Word Ban.

75. Segarra-Bohlinger's remarks did not disrupt, disturb, impede, or otherwise interfere with the orderly conduct of the meeting.

76. No audience member shouted or otherwise disrupted the meeting in response to Segarra-Bohlinger's remarks.

77. After Segarra-Bohlinger left the podium, Councilmember Heather Hutt asked Council President Pro Tempore Bob Blumenfield, who was then presiding over the meeting, to issue Segarra-Bohlinger a warning under the Word Ban because Segarra-Bohlinger's remarks "offended" her. *Id.* at 02:05:28.

78. Blumenfield warned Segarra-Bohlinger "not to use that word ['cunt'] again" and that she would be "subject to removal" if she did so. *Id.* at 02:05:42–06:04.

79. The Council held another regular meeting on December 3, 2025.

80. Video of the regular Council meeting on December 3, 2025, is publicly available on the City Clerk's YouTube Channel. LACityClerk, *Regular City Council – 12/3/25* (YouTube, Dec. 3, 2025), https://www.youtube.com/watch?v=XePOD5fR98w.

81. While addressing the Council during the public-comment period, Segarra-Bohlinger again criticized the Council and Word Ban, this time singing a parody of Adele's "Someone Like You."

82. The lyrics to Segarra-Bohlinger's parody read in full:

> I heard Nithya Raman said
> That she doesn't give weight to CISes
> Because voter turnout's low
> She won't consider NCs when she casts her votes

> I hate to turn up so rarely now to Council chambers
> Just to air these grievances, but a lot of us are angered
> Your priorities need some rearranging
> If you care about your City
>
> Still, I won't call you a cunt
> To reiterate, I'm not calling anyone a cunt
> Even though I'm upset by your censorship
> Still, I would never call anyone here a cunt

*Id.* at 01:13:14–14:10.

83. As Segarra-Bohlinger used the terms, "CIS" is an abbreviation for "community impact statement," and "NC" is an abbreviation for "neighborhood council."

84. As Segarra-Bohlinger finished singing, Council President Harris-Dawson paused her time and issued her a warning under the Word Ban. *Id.* at 01:14:13–22.

85. When Segarra-Bohlinger's time resumed, she said the word "cunt" once, and then promptly left the podium when her allotted time expired. *Id.* at 01:14:44.

86. Segarra-Bohlinger's remarks did not violate any Council Rule other than the Word Ban.

87. Segarra-Bohlinger's remarks did not disrupt, disturb, impede, or otherwise interfere with the orderly conduct of the meeting.

88. No audience member shouted or otherwise disrupted the meeting in response to Segarra-Bohlinger's remarks.

89. Still, Harris-Dawson ordered Segarra-Bohlinger to leave the meeting and barred her from attending Council and committee meetings for the remainder of that day. *Id.* at 01:14:47.

90. Under the Meeting Ban, Segarra-Bohlinger also could not attend any Council or committee meeting the next meeting day.

91. Segarra-Bohlinger was thus unable to attend six subsequent public meetings: two committee meetings later that day and, on December 5, a Council meeting and three committee meetings.

92. On or about July 23, 2026, counsel for Segarra-Bohlinger submitted a cease-and-desist letter to the Council, via the City Clerk in accord with Government Code section 54960.2(a)(1), concerning the Council's enforcement of the Word Ban and Meeting Ban against her. The letter explained the Word Ban and Meeting Ban violate the First Amendment and Brown Act on their face and as applied to Segarra-Bohlinger's remarks during the October 31 and December 3 public-comment periods, and demanded the Council permanently repeal the Word Ban and Meeting Ban and unconditionally commit to stop removing and threatening to remove speakers based on the language they use absent actual disruption of the meeting.

93. A true and correct copy of Segarra-Bohlinger's cease-and-desist letter is attached as **Exhibit C**.

94. The Council has not responded to Segarra-Bohlinger's letter.

95. The Council and its committees continue to enforce the Word Ban against speakers who utter the prohibited words during public comment and the Meeting Ban against members of the public removed from a meeting.

## INJURIES TO PLAINTIFF AND THE CITY'S LIABILITY FOR CONSTITUTIONAL VIOLATIONS

96. The City of Los Angeles violated Segarra-Bohlinger's rights under the First Amendment and Brown Act by establishing, maintaining, and enforcing the Word Ban and Meeting Ban.

97. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

98. The City, through Council President Pro Tempore Blumenfield's actions while presiding over the Council meeting on October 31, 2025, injured Segarra-Bohlinger by threatening to remove her from the meeting for uttering a prohibited word.

99. The City, through Council President Harris-Dawson's actions while presiding over the Council meeting on December 3, 2025, injured Segarra-Bohlinger by threatening to remove her from the meeting for uttering a prohibited word, and again by removing her from the meeting and excluding her from future Council and committee meetings for repeating that word.

100. The City is liable for the violations of Segarra-Bohlinger's First Amendment rights because a municipality is subject to liability for constitutional violations caused by its official policies. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

101. The Word Ban and Meeting Ban are official City policies. The Council possesses the City's final policymaking authority concerning the adoption and enforcement of rules governing public attendance and participation at Council and committee meetings. L.A., Cal., Charter § 242. The Council exercised that authority by adopting the Word Ban and Meeting Ban and incorporating them into the Council Rules.

102. Pursuant to the Word Ban, the Council threatened to remove Segarra-Bohlinger from the October 31 and December 3 meetings, and removed her from the December 3 meeting, for her protected speech. The Word Ban thus directly caused violations of Segarra-Bohlinger's First Amendment rights and was the moving force behind her constitutional injuries.

103. Segarra-Bohlinger's removal from the December 3 meeting automatically triggered the Meeting Ban, which excluded her from future Council and committee meetings. The Meeting Ban thus directly caused the

resulting violations of Segarra-Bohlinger's First Amendment rights and was the moving force behind her constitutional injuries.

104. Segarra-Bohlinger intends to continue attending Council and committee meetings and criticizing City officials and policies during public-comment periods. In doing so, she wants to exercise her First Amendment right to use the words she considers most fitting to express her views, including words prohibited by the Word Ban when she considers them appropriate to her message.

105. If Segarra-Bohlinger again uses a prohibited word at a Council or committee meeting, she will have her speaking time cut off and risks removal from the meeting and prospective exclusion from Council and committee meetings.

106. Segarra-Bohlinger faces an ongoing and credible threat of continued enforcement of the unconstitutional Word Ban and Meeting Ban, as evidenced by the Council's past enforcement against her and by operation of the Word Ban and Meeting Ban to prohibit her intended future speech under pain of being silenced, removed, and prospectively excluded from Council and committee meetings.

107. The Word Ban and Meeting Ban will continue to violate Segarra-Bohlinger's rights, forcing her to either self-censor her protected speech or continue to use a prohibited word and risk additional removals and prospective exclusions. This operation of the Word Ban and the Meeting Ban therefore imposes a continuing chill on Segarra-Bohlinger's speech and in doing so causes and will continue to cause irreparable harm unless enjoined.

108. The Council has no legitimate interest in enforcing the Word Ban and Meeting Ban in violation of the First Amendment, while it is "always in the public interest to prevent the violation of a party's constitutional rights."

*Meinecke v. City of Seattle*, 99 F.4th 514, 526 (9th Cir. 2024) (cleaned up). The balance of interests therefore favors injunctive relief.

109. An actual and ongoing controversy exists because Segarra-Bohlinger intends to continue participating in Council and committee meetings and wants to exercise her First Amendment right to use a prohibited word when she considers it appropriate to her message. A declaration of the parties' rights would resolve whether the City may lawfully silence, remove, and prospectively exclude her if she does so.

## CLAIMS FOR RELIEF

### CLAIM I
### First Amendment Violation—Freedom of Speech and Petition
### 42 U.S.C. § 1983
### (Word Ban Facial Challenge)

110. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

111. The First Amendment, applicable to the City of Los Angeles and its Council through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech … or of the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I.

112. Criticizing government officials and policy, including through "vehement, caustic, and … unpleasantly sharp attacks on government and public officials," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), "is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

113. The First Amendment likewise leaves the choice of which words are necessary to express a message to the speaker, not the government. Prohibiting particular words creates a "substantial risk of suppressing ideas in the process." *Cohen*, 403 U.S. at 26. But the First Amendment protects both the "cognitive" and "emotive" forces of language, *id.*, because "speakers, not government

officials, know best both what they want to say and how to say it," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988).

114. The First Amendment protects using "offensive" language in government buildings. *Cohen*, 403 U.S. at 26.

115. The Word Ban violates the First Amendment on four independent grounds, any one of which renders it unconstitutional on its face: (1) it discriminates based on viewpoint and is thus unconstitutional *per se*; (2) it is, even if not unconstitutional *per se*, not narrowly tailored to serve a compelling governmental interest; (3) it is unreasonable in light of the purpose of public-comment periods; and (4) it is an unconstitutional prior restraint. The Word Ban is also unconstitutionally overbroad, as alleged in Claim II.

**The Word Ban discriminates on the basis of viewpoint.**

116. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Such viewpoint discrimination occurs when the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for" a restriction on speech and is "impermissible no matter the forum." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) (first quoting *Rosenberger*, 515 U.S. at 829; and then *Nurre v. Whitehead*, 580 F.3d 1087, 1095 n.6 (9th Cir. 2009)).

117. A speaker's viewpoint encompasses not only the speaker's "particular thoughts and ideas on a given topic," but also the speaker's decision about "'how best to speak' and express those ideas." *Utah Pol. Watch*, 179 F.4th at 1263 (Tymkovich, J., concurring) (quoting *Chiles*, 607 U.S. at 640).

118. The Word Ban discriminates based on viewpoint because it prohibits particular words based on the Council's judgments about their meaning and offensiveness and why speakers choose to use them. It likewise

prohibits those words based on the actual or anticipated negative reactions of listeners to the messages the Council attributes to them.

119. Critically, "[g]iving offense is a viewpoint," *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion), and a speech restriction that "reflects the Government's disapproval of a subset of messages it finds offensive … is the essence of viewpoint discrimination," *id.* at 249 (Kennedy, J., concurring). The government may not suppress speech because officials consider the speech offensive, believe the speaker intends for the speech to cause offense, or believe others will consider the speech offensive. *See Iancu v. Brunetti*, 588 U.S. 388, 394 (2019); *Cohen*, 403 U.S. at 21–23.

120. Moreover, the government cannot "insulate a law from charges of viewpoint discrimination by tying censorship to the [audience's] reaction." *Matal*, 582 U.S. at 250 (Kennedy, J., concurring). When the government suppresses speech in response to listeners' reactions to a speaker's viewpoint, it engages in viewpoint discrimination. *See id.*; *Meinecke*, 99 F.4th at 522 (suppressing speech because of "anticipated disorderly or violent reaction of the audience" is a "prototypical heckler's veto"); *see also Rosenbaum v. City & County of San Francisco*, 8 F. App'x 687, 692 n.1 (9th Cir. 2001) ("If the city is employing a 'heckler's veto,' then it is discriminating on the basis of viewpoint, because the hecklers' complaints to the police are alleged to be on the basis of viewpoint.").

121. The First Amendment forbids such viewpoint discrimination. *See Iancu*, 588 U.S. at 393–99 (holding bar on "immoral" or "scandalous" trademark registration facially violated First Amendment as viewpoint discriminatory); *see also Ogilvie v. Gordon*, 540 F. Supp. 3d 920, 927–30 (N.D. Cal. 2020) (same for DMV regulation prohibiting personalized license plates deemed "offensive to good taste and decency"). The Word Ban therefore violates the First Amendment on that basis alone.

**The Word Ban cannot survive strict scrutiny.**

122. Even if viewpoint discrimination is not unconstitutional *per se*, the Word Ban is subject to—and fails—strict scrutiny.

123. Viewpoint discrimination is an "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. A content-based restriction on protected speech is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted).

124. The Word Ban cannot satisfy strict scrutiny because shielding listeners from protected speech they find offensive is not a legitimate governmental interest, much less a compelling one. *See Cohen*, 403 U.S. at 21–26; *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 969–70 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). As the Ninth Circuit has said, "it is not the function of government to promote speech it deems more valuable and to suppress speech it deems less valuable." *Lind v. Grimmer*, 30 F.3d 1115, 1119 (9th Cir. 1994).

125. The City may have a legitimate interest in conducting orderly and efficient Council and committee meetings, *see White*, 900 F.2d at 1425, but the Word Ban is not necessary to further that interest. "If a less restrictive alternative would serve the state's … interest with the same level of effectiveness, the state must use that alternative." *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

126. The Brown Act and other Council Rules each provide a less restrictive means of maintaining order by authorizing the presiding officer to remove a speaker who actually disrupts a Council or committee meeting. *See* Cal. Gov't Code § 54957.95(a); Council Rule 12.

127. The Word Ban is also not narrowly tailored because it is overinclusive. A speech restriction is narrowly tailored only if it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Victory Processing*, 937 F.3d at 1227 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

128. The Word Ban does not target disruption, the City's legitimate concern. *See Norse*, 629 F.3d at 976. Instead, it prohibits two words regardless of context or whether their use actually disrupts a meeting, thereby suppressing protected speech that does not implicate the interest the Word Ban purportedly serves.

129. The Word Ban's underinclusiveness further demonstrates its lack of narrow tailoring. When a speech restriction "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*," the disparity "raise[s] doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Victory Processing*, 937 F.3d at 1228 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448, 451 (2015)).

130. The Word Ban prohibits the words "cunt" and "nigger" based on the Council's concern those words will offend listeners and trigger disruptive reactions. Yet it leaves speakers free to use countless other words equally capable of offending listeners or triggering the same reactions. The Word Ban therefore leaves unregulated speech that affects the City's purported interests in comparable ways.

131. The Word Ban therefore cannot survive strict scrutiny because it does not further a compelling governmental interest and is not narrowly tailored to serve the City's legitimate interest in conducting orderly and efficient meetings.

**The Word Ban is an unconstitutional restriction on speech in a limited public forum.**

132. The public-comment periods of Council and committee meetings are limited public forums because the Council has opened them for members of the public to address City officials directly about matters of public concern. "Citizens have an enormous first amendment interest in directing speech about public issues to those who govern their city," and opening government meetings for that purpose creates a limited public forum. *White*, 900 F.2d at 1425.

133. In a limited public forum, speech restrictions are permissible only if they are viewpoint neutral and reasonable in light of the forum's purpose. *Norse*, 629 F.3d at 975, 976 n.10.

134. The Word Ban is not viewpoint neutral for the reasons alleged *supra* ¶¶ 116–21.

135. The Word Ban is also unreasonable in light of the purpose of the forum. "The 'very purpose' of a council meeting 'is the creation of a forum for public discourse and decisionmaking.'" *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1131 (D. Or. 2015) (quoting *White*, 900 F.2d at 1425 n.3); *see* Cal. Gov't Code §§ 54950, 54954.3(a)(1).

136. Consistent with that purpose, the Council may regulate public comment to maintain order and conduct its business efficiently. *See White*, 900 F.2d at 1425. But a rule that does not "require a person actually to disturb a meeting before being ejected" violates the First Amendment on its face. *Norse*, 629 F.3d at 976. "Actual disruption means actual disruption," and the government "cannot define disruption so as to include non-disruption." *Id.*

137. A speaker's "bare violation" of a meeting rule cannot constitute actual disruption; "something more" is required. *Dowd*, 2013 WL 4039043, at *17 (citing *Acosta v. City of Costa Mesa*, 718 F.3d 800, 810 n.5 (9th Cir. 2013)

(per curiam)). Yet when a previously warned speaker repeats a prohibited word, the Word Ban requires the presiding officer to stop the meeting, reissue the order not to use the word, and declare that the need to reissue the order "has actually disrupted the meeting" whether or not there was any disruption beyond the interruption the presiding officer initiated.

138. That interruption does not transform the speaker's bare violation of the Word Ban into actual disruption. The Council cannot manufacture actual disruption by interrupting protected speech to enforce its own restriction. *See, e.g.*, *Fellers v. Kelley*, No. 25-1442, 2026 WL 2517131, at *6 (1st Cir. Aug. 26, 2026).

139. The Word Ban is also unreasonable because it suppresses speech fully consistent with the purpose of public comment based solely on the speaker's choice of words, applying even when the speaker remains on topic, stays within their allotted time, complies with every other meeting rule, and does not otherwise interfere with the orderly conduct of the meeting.

140. The offensiveness of the prohibited words does not make that restriction reasonable. "[I]t is not reasonable to prohibit speech in [government buildings] merely because it may offend some people's sense of decorum." *Sammartano*, 303 F.3d at 969.

141. The Word Ban's poor fit with the Council's asserted interests and the availability of less restrictive alternatives further demonstrates the Word Ban's unreasonableness. Although the government "need not choose the least restrictive alternative when regulating speech in" a limited public forum, "its failure to select simple available alternatives suggests that the ban it has enacted is not reasonable." *Id.* at 967 (citation omitted). For the reasons alleged *supra* ¶¶ 125–30, the Word Ban is both overinclusive and underinclusive, and simple available alternatives would allow the Council to maintain order while restricting less speech.

142. The Word Ban is also unreasonable because it is not "capable of reasoned application." A restriction in a limited public forum must provide "objective, workable standards" to guide officials charged with administering it. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21–23 (2018).

143. The Word Ban does not satisfy that requirement. Although it mandates that a presiding officer cut off a previously warned speaker who repeats a prohibited word, it makes the speaker "subject to *possible* removal and exclusion" without identifying circumstances in which removal, rather than termination of the speaker's remaining time, is warranted. Ex. A (emphasis added). The Word Ban thus provides no objective standard for determining when the same prohibited speech warrants the additional consequences of removal and, in turn, prospective exclusion under the Meeting Ban.

144. That standardlessness independently renders the Word Ban unreasonable. Without objective standards governing removal, a presiding officer has unbridled discretion to impose materially different consequences for identical conduct. "Nothing in the [Word Ban] prevents the official from encouraging some views and discouraging others through the arbitrary [exercise] of" that rule's removal authority. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *see Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) (explaining "standardless discretion" creates an unacceptable risk of "viewpoint discrimination"). "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Forsyth County*, 505 U.S. at 133; *accord City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988).

145. The Word Ban therefore violates the First Amendment's requirements for restrictions on speech in a limited public forum because it is viewpoint based and unreasonable in light of the purpose of public-comment

periods: it suppresses speech fully consistent with that purpose absent actual disruption, does not reasonably further the Council's interest in maintaining order, and provides neither objective standards nor meaningful constraints on presiding officers' discretion to remove speakers.

**The Word Ban imposes an unconstitutional prior restraint.**

146. The Word Ban independently violates the First Amendment by imposing a prior restraint on protected speech that operates in advance of speech rather than allowing it to occur and addressing any unlawful conduct afterward. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 558–59 (1975).

147. A prior restraint on protected speech bears a "'heavy presumption' against its constitutional validity," and the government carries a correspondingly "heavy burden" to justify one. *Org. for a Better Aus. v. Keefe*, 402 U.S. 415, 419 (1971) (citations omitted). That is because "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," as "[i]t is always difficult to know in advance what an individual will say." *Se. Promotions*, 420 U.S. at 559.

148. The Word Ban operates as a prior restraint, first by categorically prohibiting in advance any utterance of the specified words, regardless of context or effect; and then by imposing a "warning" prohibiting in advance their further utterance.

149. Specifically, speakers may not use the words the Word Ban prohibits; but if they do, it requires the presiding officer to order the speaker not to use the word again at that or any future Council or committee meeting, thereby prospectively prohibiting the speaker from repeating the word before the Council knows the context in which the speaker would use it, the message the speaker would express, or whether the speech would actually disrupt the meeting.

150. The City cannot carry its heavy burden of justifying the Word Ban's prior restraint. "'[A] law subjecting the exercise of First Amendment freedoms to [a] prior restraint' … must itself pass constitutional muster." *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1071 (9th Cir. 2022) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). The Word Ban does not. For the reasons alleged *supra* ¶¶ 116–45, it discriminates based on viewpoint, fails strict scrutiny, and unreasonably restricts speech in a limited public forum.

151. The Council's asserted interests in protecting listeners from offense and preventing possible disruption cannot justify restraining protected speech in advance. Prior restraint cannot rest on "surmise or conjecture that untoward consequences may result," but instead demands consequences comparable to "imperiling the safety of a transport already at sea." *N.Y. Times Co. v. United States*, 403 U.S. 713, 725–27 (1971) (Brennan, J., concurring); *see also id.* at 730 (Stewart, J., concurring) (prior restraint publishing Pentagon Papers not justified absent evidence publication would cause "direct, immediate, and irreparable damage to our Nation or its people").

152. The Word Ban compounds the constitutional dangers of its prior restraint by coupling it with unbridled discretion over whether to remove a speaker who violates it. *See supra* ¶¶ 142–45. "The mere existence of the [government's] unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Plain Dealer Publ'g*, 486 U.S. at 757.

153. The Word Ban therefore imposes an unconstitutional prior restraint on protected speech.

**CLAIM II**
**First Amendment Violation—Overbreadth**
**42 U.S.C. § 1983**
**(Word Ban Facial Challenge)**

154. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

155. A law is unconstitutional on its face if it "lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

156. And in First Amendment cases, even when a law has some legitimate sweep, it is facially unconstitutional when it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep," such that its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). This "less demanding" standard provides "breathing room for free expression." *Id.* at 723 (quoting *Hansen*, 599 U.S. at 769).

157. For public meetings, a rule is unconstitutionally overbroad if it authorizes ejecting attendees for conduct that does not actually disrupt the meeting. *See Acosta*, 718 F.3d at 813–17; *Norse*, 629 F.3d at 976.

158. The Word Ban is unconstitutionally overbroad because it authorizes presiding officers to terminate a speaker's time and remove the speaker from a meeting and trigger exclusion from future meetings, based solely on the speaker repeating a prohibited word, even when the speaker did not actually disrupt the meeting.

159. The First Amendment protects speech unless it falls into one or more categories of unprotected speech, such as incitement, true threats, defamation, fraud, obscenity, or speech integral to criminal conduct. *See Chiles*, 607 U.S. at 641. These categories are "few and narrowly drawn." *Id.*

160. The words "cunt" and "nigger" do not, by themselves, fall within a category of unprotected speech. *See United States v. Bartow*, 997 F.3d 203, 209 (4th Cir. 2021); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).

161. The Word Ban applies expansively and without limitation, reaching every use of the words "cunt," "nigger," and their "variations," regardless of whether the speech at issue falls within those limited, narrowly defined categories. For that reason, the universe of its potential applications is as broad as the potential uses of the words themselves. The Word Ban reaches uses of the prohibited words to criticize or support City officials or policies, including the Word Ban; condemn or endorse another person's use of the words; quote judicial opinions, historical sources, literature, or statements by others; the words in parody, satire, or other protected expression. The Word Ban also applies regardless of whether a speaker directs a prohibited word at someone or expressly disclaims doing so; uses the word approvingly or disapprovingly; or merely quotes, discusses, or refers to it.

162. The Word Ban therefore reaches a substantial amount of protected speech and is not susceptible to a narrowing construction requiring actual disruption.

163. The Word Ban has little, if any, plainly legitimate sweep. The Council has no legitimate interest in protecting listeners from protected speech that offends them. *See Cohen*, 403 U.S. at 26; *Sammartano*, 303 F.3d at 969. And although the Council has a legitimate interest in maintaining order at its meetings, pre-existing Council Rules already authorized presiding officers to cut off and remove a speaker who actually disrupts a meeting.

164. Those pre-existing rules separately address the actual disruption in which the Council has a legitimate interest, while the Word Ban adds a categorical prohibition on particular words regardless of whether their use

causes actual disruption. Nor does the Word Ban acquire a legitimate sweep merely because particular uses of a prohibited word may, depending on context, independently fall within a narrowly defined category of unprotected speech.

165. Because the Word Ban has no plainly legitimate sweep, it violates the First Amendment on its face.

166. In addition, or in the alternative, if the Word Ban has any plainly legitimate sweep, it is limited to particular applications involving speech that independently falls within a narrowly defined category of unprotected speech or conduct that the Council may constitutionally regulate because it actually disrupts a meeting. Those limited applications are substantially outweighed by the Word Ban's applications to protected, non-disruptive speech, rendering it facially unconstitutional.

**CLAIM III**
**First Amendment Violation—Freedom of Speech and Petition**
**42 U.S.C. § 1983**
**(Word Ban As-Applied Challenge)**

167. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

168. The "underlying constitutional standard" for an as-applied First Amendment challenge "is not different [than] in a facial challenge." *Babylon Bee, LLC v. Lopez*, 818 F. Supp. 3d 1181, 1207 (D. Haw. 2026) (quoting *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010)). Accordingly, under the same constitutional principles and for the same reasons alleged in Claims I and II, the Word Ban is unconstitutional as applied to Segarra-Bohlinger.

169. Segarra-Bohlinger exercised her First Amendment rights to speak and petition when she used the Council's public-comment periods on October 31 and December 3, 2025, to address City officials directly and express

grievances about their actions and policies, including the Council's adoption and enforcement of the Word Ban.

170. On October 31, Segarra-Bohlinger said the word "cunt" as part of her criticism that the Council prioritized banning offensive words over other matters of public concern.

171. On December 3, Segarra-Bohlinger again said the word "cunt" as part of her criticism of the Council and its restrictions on speech during public comment.

172. Segarra-Bohlinger did not disrupt either meeting. At both meetings, she stayed on topic and within her allotted time, promptly left the podium when her time expired, did not violate any Council Rule other than the Word Ban, and did not otherwise prevent the Council from proceeding in an efficient and orderly manner.

173. No audience member shouted, interrupted, or otherwise disrupted either meeting in response to Segarra-Bohlinger's speech.

174. Nevertheless, the City enforced the Word Ban against Segarra-Bohlinger at both meetings based solely on the words she chose to express her grievances about City officials and policies.

175. That enforcement was viewpoint discriminatory because it was based on the City's judgments about the meaning and offensiveness of the prohibited words and why speakers, including Segarra-Bohlinger, choose to use them; and it was unreasonable in light of the purpose of public-comment periods because Segarra-Bohlinger was using those forums for their intended purpose and did not disrupt either meeting. The decision to remove her from the December 3 meeting was also unreasonable because it was not made pursuant to an objective standard capable of reasoned application.

176. The City therefore violated Segarra-Bohlinger's First Amendment rights by enforcing the Word Ban against her.

**CLAIM IV**
**Brown Act Violation**
**Cal. Gov't Code § 54960**
**(Word Ban Facial Challenge)**

177. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

178. The Brown Act guarantees members of the public the right to attend meetings of local legislative bodies and to address those bodies about matters over which they are responsible. Cal. Gov't Code §§ 54953(a), 54954.3(a)(1).

179. Under California law, local governments cannot adopt meeting rules inconsistent with the Brown Act. *See S.D. Union v. City Council*, 146 Cal. App. 3d 947, 957–58 (1983).

180. Although the Brown Act allows local legislative bodies to adopt "reasonable regulations" governing public comment, those rules must facilitate, and may not undermine, the Brown Act's guarantee of public participation, and a legislative body "shall not prohibit public criticism of the policies, procedures, programs, or services of the agency, or of the acts or omissions of the legislative body." Cal. Gov't Code § 54954.3(b)(1), (c).

181. The Word Ban is not a reasonable regulation of public comment.

182. The Word Ban suppresses certain words and prevents their use in criticizing the City or Council because the Council considers them offensive.

183. A categorical prohibition on words based solely on their communicative content is not reasonably related to encouraging participation in, or ensuring the orderly administration of, public comment.

184. The Word Ban also gives the Council authority that is inconsistent with the Brown Act, which guarantees the right of all persons to attend meetings of legislative bodies except as expressly stated in the Brown Act. *Id.* § 54953(a).

185. The Brown Act limits a legislative body's authority to remove a person from a meeting. A person may not be removed from a public meeting unless that person "engage[s] in behavior … that actually disrupts, disturbs, impedes, or renders infeasible the orderly conduct of the meeting" and, after receiving the required warning, does not promptly cease that behavior. *Id.* § 54957.95(a)(1), (b)(1).

186. The Word Ban does not require actual disruption prior to enforcement.

187. The Word Ban treats the presiding officer's own interruption of the meeting as the disruption necessary to justify removing a speaker.

188. The Brown Act does not permit a city council to create its own disruption.

189. Because the Word Ban is not a reasonable regulation of public comment, prohibits the use of prohibited words in criticizing the City or Council, and authorizes removal absent actual disruption, it facially violates the Brown Act.

**CLAIM V**
**Brown Act Violation**
**Cal. Gov't Code § 54960**
**(Word Ban As-Applied Challenge)**

190. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

191. The Brown Act guaranteed Segarra-Bohlinger's right to attend the October 31 and December 3, 2025, regular Council meetings and speak during public comment about matters within the Council's jurisdiction and to criticize the City and Council while doing so. Cal. Gov't Code §§ 54953(a), 54954.3(a)(1), (c).

192. On both dates, Segarra-Bohlinger remained within her allotted time, addressed only City officials and policies and other matters within the

Council's jurisdiction, and promptly yielded the podium when her time expired.

193. She did not prevent the Council from proceeding, impede another speaker, or otherwise render the orderly conduct of either meeting infeasible.

194. Her speech therefore did not "actually disrupt, disturb, impede, or render infeasible" the orderly conduct of either meeting within the meaning of the Brown Act. *See id.* § 54957.95.

195. The only ground the Council identified to threaten or effectuate Segarra-Bohlinger's removal was her use of a word prohibited by the Word Ban.

196. The Council thus lacked authority under the Brown Act to threaten to remove Segarra-Bohlinger from the Council meetings on October 31 or December 3, 2025, or to remove her from the December 3 meeting.

197. By enforcing the Word Ban against Segarra-Bohlinger absent actual disruption, the City violated the Brown Act.

**CLAIM VI**
**First Amendment Violation–Freedom of Speech and Petition**
**42 U.S.C. § 1983**
**(Meeting Ban Facial Challenge)**

198. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

199. Because Council and committee meetings are open for public participation, restrictions on the public's ability to participate must be viewpoint neutral and reasonable in light of the purpose of the forum. *Norse*, 629 F.3d at 976 n.10.

200. The Council's authority to remove a person who actually disrupts an ongoing meeting does not extend to prohibiting that person from attending future meetings merely because officials believe the person might disrupt a future meeting.

201. That is because an exclusion "based on a past incident, or even several past incidents, of disruption" is grounded in "possible or assumed disruption in the future," not actual disruption in the present. *Walsh*, 154 F. Supp. 3d at 1133.

202. The Meeting Ban automatically bars a person removed from a Council or committee meeting from attending future Council and committee meetings for, at minimum, the rest of that day and the next meeting day.

203. The Meeting Ban does not require a finding that the excluded person has actually disrupted the future meeting(s) with their present conduct or would actually disrupt the future meeting if permitted to attend.

204. Nor does the Meeting Ban require a finding that ordinary meeting rules would be inadequate to maintain order at the future meeting if and when actual disruption occurs.

205. The Meeting Ban compounds the constitutional injury of a removal under the Word Ban by automatically prohibiting attending future meetings.

206. The Meeting Ban cannot be justified as a measure to deter "serial disrupters." The Council "has the continuing ability to maintain decorum in Council meetings by ordering disruptive individual [*sic*] immediately to leave the City Council Chambers. Maintaining decorum does not, however, require prolonged and prospective exclusions from a forum intended for public discourse and debate." *Id.* at 1131.

207. The Council does not provide adequate alternative channels of communication for excluded individuals to attend and participate in Council and committee meetings.

208. The Meeting Ban is therefore unreasonable in light of the purpose of Council and committee meetings and violates the First Amendment on its face.

**CLAIM VII**
**First Amendment Violation—Prior Restraint**
**42 U.S.C. § 1983**
**(Meeting Ban Facial Challenge)**

209. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

210. The Meeting Ban imposes a prior restraint by automatically prohibiting a person removed from a Council or committee meeting from attending and participating in future meetings. That prospective exclusion restrains the person's exercise of First Amendment rights before the future meetings occur.

211. The Meeting Ban cannot overcome the heavy presumption against its constitutional validity for the reasons alleged *supra* Claim VI. *See Nat'l Sec. Letter*, 33 F.4th at 1071. As alleged there, prospective exclusion is unreasonable in light of the purpose of Council and committee meetings because the Council can address actual disruption if and when it occurs rather than exclude a person based on possible or assumed future disruption.

212. The Meeting Ban also couples its prior restraint with unbridled discretion. Although the Council or committee may overrule the predicate removal by majority vote, unless it does so, the Meeting Ban's prospective exclusion automatically follows. But the Council Rules provide no standards governing whether the Council or committee should overrule that removal. The Meeting Ban thus gives the Council and its committees unbridled discretion over whether a person ordered to leave a meeting may attend and participate in future meetings. *See Plain Dealer Publ'g*, 486 U.S. at 757, 763–64.

213. The Meeting Ban also lacks the procedural safeguards required "to obviate the dangers of" a system of prior restraint. *See Se. Promotions*, 420 U.S. at 559 (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). Such a system "avoids constitutional infirmity only if," among other things, the government

bears the burden of initiating judicial proceedings and establishing the restraint is constitutionally permissible, any restraint imposed before judicial review "preserv[es] the status quo" and is limited to a "specified brief period," and "a prompt final judicial determination [is] assured." *Id.* at 560 (citing *Freedman*, 380 U.S. at 58).

214. The Meeting Ban provides none of those safeguards. The prospective exclusion takes effect automatically without requiring the City to initiate judicial proceedings to sustain it, thereby placing the onus on the excluded person to challenge the restraint. It does not preserve the status quo pending judicial review because the person is immediately barred from attending and participating in future meetings. And it provides no procedure assuring a prompt final judicial determination before those opportunities are lost. Instead, the exclusion remains in effect unless the Council or committee overturns the predicate removal or the excluded person affirmatively seeks and obtains judicial relief.

215. The Meeting Ban therefore imposes an unconstitutional prior restraint on constitutionally protected speech and petitioning activity.

**CLAIM VIII**
**First Amendment Violation–Freedom of Speech and Petition**
**42 U.S.C. § 1983**
**(Meeting Ban As-Applied Challenge)**

216. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

217. The Meeting Ban violates the First Amendment for the reasons stated in Claims VI and VII.

218. The Council removed Segarra-Bohlinger from its December 3, 2025, regular meeting under the Word Ban solely for repeating a prohibited word, even though she did not disrupt the meeting.

219. That removal automatically triggered the Meeting Ban, excluding Segarra-Bohlinger from attending and participating in Council and committee meetings for the remainder of that day and the following meeting day.

220. As explained in Claim VI, the First Amendment does not permit the City to prohibit a member of the public from attending and participating in a future public meeting based on speculation that the person may engage in disruptive conduct at the future meeting.

221. By excluding Segarra-Bohlinger from future Council and committee meetings without an individualized determination that she would actually disrupt those meetings, the Council violated her First Amendment rights.

222. Prospectively excluding Segarra-Bohlinger also was not reasonable, as the Council had available a "simple alternative": It could order her to leave a future meeting if she actually disrupts it. *See Walsh*, 154 F. Supp. 3d at 1131–32.

223. The City therefore violated Segarra-Bohlinger's First Amendment rights by enforcing the Word Ban against her.

**CLAIM IX**
**Brown Act Violation**
**Cal. Gov't Code § 54960**
**(Meeting Ban Facial Challenge)**

224. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

225. The Brown Act guarantees the right to attend Council and committee meetings and authorizes removal from a meeting only when a person "actually disrupts, disturbs, impedes, or renders infeasible" the orderly conduct of that meeting and does not promptly cease their behavior after a warning. Cal. Gov't Code §§ 54953(a), 54957.95(a), (b)(1).

226. The Brown Act does not authorize a legislative body to exclude a person from a future meeting based on that person's prior disruptive conduct.

227. The Meeting Ban thus violates the Brown Act by barring people from future Council and committee meetings based on a prior removal.

**CLAIM X**
**Brown Act Violation**
**Cal. Gov't Code § 54960**
**(Meeting Ban As-Applied Challenge)**

228. Segarra-Bohlinger re-alleges and re-incorporates the preceding paragraphs as though fully set forth herein.

229. The Brown Act guaranteed Segarra-Bohlinger the right to attend the Council and committee meetings held during the period of her exclusion. *See* Cal. Gov't Code § 54953(a).

230. Segarra-Bohlinger did not actually disrupt, disturb, impede, or render infeasible the orderly conduct of any of the six meetings on December 3 and 5, 2025, from which the Meeting Ban excluded her.

231. The Meeting Ban excluded her automatically because she had been removed from the Council meeting on December 3, 2025, for violating the Word Ban.

232. The Brown Act does not authorize prospective exclusion on that basis.

233. By excluding Segarra-Bohlinger from future Council and committee meetings absent actual disruption at those meetings, the City violated the Brown Act.

**<u>PRAYER FOR RELIEF</u>**

Segarra-Bohlinger respectfully requests this Court enter judgment against the City of Los Angeles and issue the following relief:

A. Declare the Word Ban and Meeting Ban unconstitutional, facially and as applied to Segarra-Bohlinger, under the First and Fourteenth Amendments;

B. Declare that the Word Ban and Meeting Ban violate the Brown Act on their face;

C. Declare that the City and Council violated the Brown Act by applying the Word Ban and Meeting Ban to Segarra-Bohlinger;

D. Issue a preliminary injunction and permanent injunction enjoining the City of Los Angeles (including all of its officers, agents, servants, employees, attorneys, and other persons in active concert or participation with the City) from enforcing the Word Ban and Meeting Ban;

E. Award Segarra-Bohlinger nominal damages;

F. Award Segarra-Bohlinger her attorney's fees under 42 U.S.C. § 1988, Cal. Gov't Code § 54960.5, and any other applicable law;

G. Award Plaintiff her costs; and

H. Award such other relief as the Court deems appropriate.

DATED: October 6, 2026

Respectfully submitted,

By: /s/ David Loy

David Loy
Cal. Bar No. 229235
FIRST AMENDMENT COALITION
534 4th Street, Suite B
San Rafael, CA 94901-3334
Tel: (415) 460-5060
Email: dloy@firstamendmentcoalition.org

Zachary T. Silver
D.C. Bar No. 1742271*
Gabriel Z. Walters
D.C. Bar No. 1019272*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave., SE
Suite 340
Washington, D.C. 20003
Tel: (215) 717-3473
Fax: (215) 717-3440
Email: zach.silver@thefire.org
Email: gabe.walters@thefire.org

Attorneys for Plaintiff
STACEY SEGARRA-BOHLINGER

* Pro hac vice *applications pending*

**VERIFICATION OF STACEY SEGARRA-BOHLINGER**

Pursuant to 28 U.S.C. § 1746, I, STACEY SEGARRA-BOHLINGER, declare as follows:

1. I am over the age of 18 and competent to testify.

2. I am a Plaintiff in the present case and a citizen of the United States and California.

3. I have read the foregoing Verified Complaint for Civil Rights Violations.

4. I have personal knowledge of the factual allegations in paragraphs 8–9, 13, 15, 20, 56, 63, 66–94, 103–105, 107, 109, 170–174, 192–195, 218–219, and 230–231 of the Verified Complaint and know them to be true.

5. I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 5, 2026

Stacey

Stacey Segarra-Bohlinger