# EXHIBIT F

https://www.westsidecurrent.com/news/exclusive-council-president-set-to-target-vile-slurs-in-city-hall/article_37fadc73-8811-4959-87e1-0baedcc2c310.html



FEATURED

# Exclusive: Council President Set to Target Vile Slurs in City Hall

Jon Regardie
Mar 20, 2025

*Friday's Motion Will Seek to Rein in Use of N-Word and C-Word in City Meetings. This May Just Be Baby Steps to Greater Change*

LOS ANGELES - On March 4, City Council Chambers were packed with a crowd that came to hear, and weigh in on, the fate of recently canned Fire Chief Kristin Crowley. But before any debate could occur, there was the legally required period of public comment. If you're not a habitué of City Council, or even if you are, there was an unsettling moment.

A man dressed as Batman approached the podium and, for several minutes, unleashed a torrid string of F-bombs. While discussing matters on the council agenda, he directed an expletive at a Deputy City Attorney and made derogatory comments about Jews and the Pope. Most disturbing, he twice referred to people as a "dirty N[-word]."

The comments were vile. But for many in the room, they were par for the course. The Deputy City Attorney sought to explain to the gallery that the man, who I'll refrain from naming, is a frequent gadfly. "The First Amendment requires us to allow people to speak during public comment," he said, noting that neither the council nor the city condoned or agreed with what was uttered. He added that the man "and his friends like to offend as many people as possible and often try to get a rile out of people here."




That's all true, and it's been happening for years, with the result that Angelenos who take the time to address the council on issues of civic importance get stuck in a foul-mouthed swamp with a slew of gadflies whose M.O. seems to be to shock and offend. The N-word may be cruelly directed at Black councilmembers, and speakers may use a C-word to refer to women office holders. Other slurs refer to people of Jewish or Latino descent. And so on.

It's a situation that has long been decried, but has seemed impossible to stop. Now, finally, some city leaders are waging a carefully planned counter-offensive. On Friday, Council President Marqueece Harris-Dawson will introduce a motion designed to combat some of the most abrasive language.

"It will focus on racial and other epithets, specifically," Harris-Dawson told me this week, noting that he has been working with members of the City Attorney's office and other legal minds. "It won't cover all foul language, but it will really focus on language that is designed to attack someone's personhood and their protected status. And frankly, language that would be a hate crime anywhere outside City Hall chambers or a committee room."

***




The new motion will focus on what is known as Rule 7, which regulates public comment. It dictates that a speaker who goes off topic or disrupts a meeting will get a warning, and on a second offense will have their comment terminated, and be prohibited from testifying publicly for the rest of the day (that extends to any later council or committee meeting). A second offense can lead to a three-day ban, and a third for even longer.

Harris-Dawson's motion will apply the same protocols and penalties to anyone who uses the N-word or the C-word.

"These particular terms would be added as something for which you can be warned, and dismissed, by whoever is chairing the meeting," he said.

This raises a lot of questions, and I threw them at Harris-Dawson. The first concerns the Brown Act, which addresses public participation in California government meetings, and the First Amendment. That crucial part of the U.S. Constitution is also why Los Angeles is in this particular boat—more

than a decade ago, the city lost a series of legal battles after it tried to restrict boisterous activity at public meetings.




> "I'm eager to get in front of a judge and show them a video of what happens in L.A. City Council and committee, and ask her or him if they think this is what is intended by the free speech that we're granted in the First Amendment and the Brown Act."

That included paying $215,000 to settle a free-speech lawsuit filed by a man who was kicked out of a meeting of the Recreation and Parks Board of Commissioners for wearing a Ku Klux Klan hood (the man, by the way, was Black), and whose attorney argued that his First Amendment rights were violated. In another case, two men who were ejected from council meetings for their language and behavior each won $1—but the city had to pony up $600,000 to cover their legal fees.

The First Amendment is front and center here, with Harris-Dawson stating, "We've written this in a way that we think will stand legal muster." He added that the motion is built around governance, with the focus on "words that would be considered disruptive in and of themselves."

Harris-Dawson made clear that specific language is being targeted, and not opposing political or other viewpoints from people who step to the podium. Still, not only does he expect this will end up in court, he welcomes it.




"I'm eager to get in front of a judge and show them a video of what happens in L.A. City Council and committee, and ask her or him if they think this is what is intended by the free speech that we're granted in the First Amendment and the Brown Act," he said.

***

Harris-Dawson sees the current moment in a broader context, and points to the harsh rhetoric coming out of Washington, D.C. in the Trump 2.0 era.

> "It's racist, it's misogynistic, it is anti-Semitic," he said that day. "You name it, we get it in that chamber."



The motion is also something he has been planning for some time. After being confirmed as Council President on Sept. 20 of last year, he told reporters that addressing this language was a priority.

"It's racist, it's misogynistic, it is anti-Semitic," he said that day. "You name it, we get it in that chamber."

That raises another question I asked Harris-Dawson—given all that is heard, why focus on just two words?

He answered that he expects his colleagues to add additional language. That could come Friday when the motion is introduced, or later as it moves to committee discussions.




Another issue is what is not in the motion—it doesn't seek to stanch profanity, meaning all the cascading F-bombs could continue. Harris-Dawson noted that the courts have ruled that the language can legally serve as an "intensifier."

That raises a difficult reality. A teacher who avoids bringing a fifth-grade class to council because of the slurs still might not do so due to ample expletives.

But Harris-Dawson is also taking a long view—addressing the entire scope of sewer sounds in City Hall could take years. I asked if he considers this a case of baby steps, starting with two offensive words, and then building.

“Absolutely,” he said, and I know he meant it because he repeated the word. “Absolutely. This is as much a step as we can take at this moment, we believe. But we think it will open us up to take additional steps in the future.”




Will the tactic work? Many people are hopeful. But there are others who, as Harris-Dawson referenced, are probably eager to take this to court, potentially because they see a payout in a lawsuit. A lot can happen.

Harris-Dawson also had another reason for doing this. While council members expect a certain level of pointed opposition, he noted that many other city workers are subjected to vile language—that includes council staffers and employees of other departments. He pointed out that, in any other business, a boss would have to protect them from this language, or risk being sued. Here the bosses must allow and accept it.

That raises another issue, and while it may sound hokey, it’s true—elected officials are people too. Fierce criticism is one thing. But offensive language can carry a deep sting. Harris-Dawson told me how one such exchange resonated.

“I had the situation,” he said, “where I was chairing a meeting and two women tried to drown out a speaker who was calling me the N-word. They were trying to shout that person down, and I had to throw them out because they were disrupting the meeting.

“I lost several nights of sleep over that, and it still bothers me to this day.”

Now, that could begin to change. Baby steps.