HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
KATHLEEN KENEALY, Chief Assistant City Attorney (SBN 212289)
STREFAN FAUBLE, Assistant City Attorney (SBN 247653)
200 North Main Street
Los Angeles, CA 90012
Tel: (213) 978-8100; Fax: (213) 978-2850
Email: strefan.fauble@lacity.org

Attorneys for Defendant CITY OF LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

STACEY SEGARRA-BOHLINGER,

Plaintiff,

vs.

CITY OF LOS ANGELES;

Defendant.

**CASE NO. 26-CV-11599- E**

**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 3

III. ARGUMENT .......... 4

A. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS BECAUSE THE CITY COUNCIL'S N- AND C-WORD PROHIBITION IS CONSTITUTIONAL. .......... 4

i. Prohibiting Use of the N- and C-word Are and Only Need to Be Reasonable and Viewpoint-Neutral. .......... 4

ii. The N- and C-word Prohibition Passes Strict Scrutiny in Any Case. .......... 6

iii. The N- and C-word Prohibition is Not Overbroad. .......... 10

iv. *Cohen*, Plaintiff's Key Case, is Distinguishable and In Fact Favors the City. .......... 11

B. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS BECAUSE VIOLATING THE N- AND C-WORD PROHIBITION IS AN ACTUAL DISRUPTION .......... 15

C. EXCLUDING DISRUPTORS FROM FUTURE MEETINGS IS NOT IMPERMISSIBLE RIOR RESTRAINT. .......... 16

D. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS BECAUSE THE COUNCIL'S RULES DO NOT VIOLATE THE BROWN ACT. .......... 17

E. THE REMAINING *WINTER* FACTORS FAVOR THE CITY .......... 18

IV. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Freedom Def. Initiative v. King Cnty.*,
904 F.3d 1126 (9th Cir. 2018) .......... 14

*Burson v. Freeman*,
504 U.S. 191 (1992) .......... 2, 7, 8, 10

*Cipolla-Dennis v. Cnty. of Tompkins*,
2021 WL 964244 (N.D.N.Y. 2021) .......... 5

*Cohen v. Cal.*,
403 U.S. 15 (1971) .......... 2, 11, 12

*Dowd v. City of Los Angeles*,
2013 WL 4039043 (C.D. Cal. 2013) .......... 15

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .......... 12

*FCC v. Pacifica*,
438 U.S. 726 (1978) .......... 14

*Good News Club v. Milford Central School*,
533 U.S. 98 (2001) .......... 4

*Hopper v. City of Pasco*,
241 F.3d 1067 (9th Cir. 2001) .......... 14

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .......... 4

*Imperial Sovereign Ct. of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......... *passim*

*Imperial Sovereign Ct. of Montana v. Knudsen*,
699 F. Supp. 3d 1018 (D. Mont. 2023) .......... 5

*In re Nat'l Sec. Letter*,
33 F.4th 1058 (9th Cir. 2022) .......... 16

*Kindt v. Santa Monica Rent Control Bd.*,
67 F.3d 266 (9th Cir.1995) ........ 4, 16

*Norse v. City of Santa Cruz*,
629 F.3d 966 (9th Cir. 2010) ........ 4

*Perry Ed. Assn. v. Perry Local Educators' Assn.*,
460 U.S. 37 (1983) ........ 3

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) ........ 3

*R.A.V. v. City of St. Paul*,
505 U.S. 377 ........ 4

*Reno v. ACLU*,
521 U.S. 844 (1997) ........ 13

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........ 4, 16

*Sable Commc'ns of Cal. v. FCC*,
492 U.S. 115 (1989) ........ 13

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969) ........ 16

*Walsh v. Enge*,
154 F. Supp. 3d 1113 (D. Or. 2015) ........ 4, 16

*White v. City of Norwalk*,
900 F.2d 1421 (9th Cir. 1990) ........ 15

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 2

**Statutes**

California Government Code section 54950 ........ 9

California Government Code section 54954.3 ........ 17, 18

Cal. Gov't Code section 54957.95 ........ 15

California Constitution, Article I, Section 3, subdivision (a) ........ 9

California Penal Code section 415 ........ 11

**Other Authorities**

Between Governance and Management: The History and Theory of the Public Forum, 34 U.C.L.A. L.Rev. 1713 (1987) ........ 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Do members of the public have a First Amendment right to call elected officials, city staff, and members of the public "niggers" and "cunts" [1] when providing public comment at Los Angeles City Council Meetings? Does the use of these two specific words toxify the meetings to the point that members of the public do not attend and lose their opportunity to stand before and petition their elected representatives, thus depriving those representatives the benefit of hearing from their constituents, and subverting the function of public comment? With regards to the former and at the expense of the latter, Plaintiff Segarra-Bohlinger says they do. If she were correct, then something has gone seriously wrong with First Amendment jurisprudence. Fortunately, Plaintiff is incorrect. The Court may think the word "toxifying" is too strong a metaphor. The City requests that the Court, before reading further, please review the videos provided via https://drive.google.com/file/d/13Bt9U-sv2N39wHGss-8_zE3j8BkLN3Q0 or this QR code

to see what happens on a nearly daily basis at Los Angeles City Council and Committee hearings. The City Council's prohibiting the use of the N- and C-word during public

[1] The City Council rule prohibits use of these two words and their variations in Council and Council Committee meetings. The remainder of this brief will refer to these two words and their variations as the "N-word" and the "C-word."

comment is a reasonable, viewpoint-neutral restriction, which, following clear Supreme Court and Ninth Circuit rulings, is all that is required to pass constitutional muster in a limited public forum such as a City Council or Committee meeting. (Plaintiff mistakenly thinks the prohibition is viewpoint-based. It is not.)

Though it does not need to, the City Council's (or simply "Council's") N- and C-word prohibition can even survive strict scrutiny because it is narrowly tailored to further a compelling government interest. The prohibition is a permissible response to the intersection of two competing constitutional rights, the right to free speech and the right to petition the government. Indeed, these are competing First Amendment rights, whose clauses are separated by a mere semicolon: "Congress shall make no law … abridging the freedom of speech … ; or the right of the people … to petition the Government for a redress of grievances."

Because of the competing First Amendment values at stake, and following the constitutional analysis in *Burson v. Freeman*, 504 U.S. 191 (1992), the N- and C-word prohibition is subject to a lesser "significant impingement" standard, which the prohibition easily meets. The City Council is permitted to respond to "deficiencies" in the public's ability to petition its elected representative "with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.* at 209.

Plaintiff fails to cite this telling case of *Burson v. Freeman* in analyzing the structure of the current constitutional dispute. Instead, Plaintiff primarily relies on *Cohen v. Cal.*, 403 U.S. 15 (1971), and its progeny, which is both distinguishable and actually undermines Plaintiff's own position. Council's N- and C-word prohibition is also, contrary to Plaintiff's claim, neither over- nor under-inclusive. It is just right.

As to Plaintiff's state-law-based claims under the Brown Act, they are easily disposed of once it becomes clear, following the First Amendment analysis, that the City Council is permitted to prohibit use of the N- and C-word and is not "manufacturing" disturbances as Plaintiff alleges.

While Defendant City rejects the Plaintiff's legal analysis, the City does accept her recitation of the key facts (though not always her characterizations of them) regarding her conduct and the Council's rules and their application to her. This dispute is essentially one of pure law.

## II. LEGAL STANDARD

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The standard for issuing a preliminary injunction is well established. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 842 (9th Cir. 2026) (citing the Supreme Court's *Winter* factors) (internal quotations marks and citations omitted).

In the context of an alleged constitutional violation, the first *Winter* factor, success on the merits, is usually dispositive. "Once a party has established the likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law," since a First Amendment violation is an irreparable injury, and the balance of equities and the public interest merge when the government is a party. *Id.* at 876 (internal quotations marks and citations omitted).

"When evaluating a preliminary injunction in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.* at 842 (internal quotations marks and citations omitted). The City acknowledges Plaintiff has made a "colorable claim" and that the burden is on the City. The question thus becomes the City's justification.

## III. ARGUMENT

### A. Plaintiff Is Unlikely to Succeed on The Merits Because the City Council's N- and C-Word Prohibition Is Constitutional.

#### i. Prohibiting Use of the N- and C-word Are and Only Need to Be Reasonable and Viewpoint-Neutral.

"[A] government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. [Citation.] In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009) (citing *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 n.7 (1983), and *Good News Club v. Milford Central School*, 533 U.S. 98, 106–107 (2001).) "In a limited public forum, such as a city council meeting, '[a] council can regulate not only the time, place, and manner of speech in a limited public forum, but also the content of speech—as long as content-based regulations are viewpoint neutral and enforced that way.'" *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1128 (D. Or. 2015) (quoting *Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010). "In addition, in a limited public forum, the government may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum.'" *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 8290 (1995) (internal citation and quotation marks omitted). "Thus, the applicable standards for regulating speech in a limited public forum are whether a restriction is viewpoint neutral and reasonable." *Id.* (citing *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270–71 (9th Cir.1995) ("[L]imitations on speech at those meetings [city council and city board meetings] must be reasonable and viewpoint neutral, but that is all they need to be.").

Council's prohibition is reasonable as it disallows language the Council has found deters public participation. This prohibition is viewpoint-neutral both on its face and in substance because it "prohibit[s] utterance of these two epithets, and their variations, regardless of the viewpoint the speaker is expressing with the words." (Pl. Memo, Ex. B

at 1 [Council motion of March 21, 2025].) A blanket ban on the use of "odious racial epithets" by "proponents of all views" constitutes a permissible regulation, unlike (as is not the case here) a ban on the use of racial slurs applicable to just one group of speakers but not to the speakers' opponents, a ban that would constitute viewpoint discrimination. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391. *See also Iancu v. Brunetti*, 588 U.S. 388, 405 (2019) (Breyer, J., concurring and dissenting in part) ("I]t is hard to see how a statute prohibiting the registration of only highly vulgar or obscene words discriminates based on 'viewpoint.' Of course, such words often evoke powerful emotions. Standing by themselves, however, these words do not typically convey any particular viewpoint."); *id.* at 415 n.5, 417, 418-19 (Sotomayor, J., concurring and dissenting in part) (indicating that a restriction on obscenity, vulgarity, or profanity, apparently including "at least one particularly egregious racial epithet," is viewpoint neutral and may be prohibited in a limited forum). *See also Cipolla-Dennis v. Cnty. of Tompkins*, 2021 WL 964244, at 9 (N.D.N.Y. 2021), aff'd, 2022 WL 1237960 (2d Cir. 2022) (upholding county legislature's prohibition against libel and slander at public comment, and quoting the Ninth Circuit affirming dismissal of a First Amendment challenge to a meeting rule that prohibited "profane, abusive, or slanderous speech during the public comment portion of Board meetings" because the rule was reasonable and viewpoint neutral).

Plaintiff disagrees, saying Council prohibits these words because it finds them offensive, and so it does not matter if the rule is neutral on its face.[2] But Council did not prohibit the words because it finds them offensive, though it certainly does find them so. (Council hears many offensive words that it doesn't proscribe.) Council prohibited the words because it found their use disrupts the purpose of public comment by deterring participation by other members of the public, infringing on the rights of other

---

[2] Plaintiff suggests the legal standard would alter if the prohibition were viewpoint-based, though that appears not to be the case. *See Imperial Sovereign Ct. v. Knudsen,* 699 F. Supp. 3d 1018, 1038 (D. Mont. 2023) (stating that a statute's "facially viewpoint-based regulation subjects it to strict scrutiny," which is the same test as for content-based restrictions outside of a limited public forum).

participants. If the tenor of the meetings were different and public participation did not suffer, Council presumably would not have adopted the prohibition on the N- and C-words. That counterfactual, however, does not undercut what Council did and why it did it: Actual and repeated use of the N- and C-word toxified Council and Committee meetings and deterred overall public participation, and that caused Council to adopt a narrowly tailored rule to protect the constitutional rights of everyone involved.

ii. <u>The N- and C-word Prohibition Passes Strict Scrutiny in Any Case.</u>

Despite the case law cited above, Plaintiff contends the N- and C-word prohibition is content-based and therefore subject to strict scrutiny even in a limited public forum such as a Council meeting. Even if Plaintiff were correct, that does not change the outcome. Applying strict scrutiny, the Council's prohibition would need to be "narrowly tailored to promote a compelling government interest." *Imperial Sovereign* at 847. The N- and C-word prohibition passes this test.

In adopting the prohibition, the Council made a number of findings, including that the Council has "the legal and moral duties to hear directly from members of the public, consistent with the Ralph M. Brown Act and state constitution" and also "the legal and moral duties to provide forums where members of the public are free to participate and exercise their constitutional right to petition their government." (Plaintiff's Memo. Ex. B at 2.) The findings continued in relevant part:

> These duties come into conflict when some members of the public in their comments to Council and its Committees use certain offensive epithets. At their worst, these members of the public refer to black members of the public, City staff, and Council members using the "N-word" and to female members of the public, City staff, and Council members using the "C-word." These two epithets, the N-word and C-word, are also, unfortunately, the most frequently used offensive and injurious epithets at Council and its Committees….
>
> ….

> Besides inciting, or threatening to incite, verbal and even physical altercations, these epithets disrupt Council and Committee meetings by deterring public participation. By creating public spaces many constituents find repellant, these toxifying modes of expression make it intolerable for many members of the public to attend and participate in the meetings. This denies elected officials the benefit of hearing from these constituents, and so subverts the function of the public comment period. It also suppresses the constitutional right of many members of the public to freely petition their government.
>
> Faced with these competing First Amendment values, the City Council correctly determined that the proper resolution was that the First Amendment should ever so slightly give way by disallowing only and exactly two words.

The Supreme Court dealt with a similar First Amendment conflict in *Burson v. Freeman*. In *Burson*, the Court considered the constitutionality of a Tennessee statute prohibiting "the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place [on election day]." 504 U.S. at 193. Because Tennessee's statute imposed a content-based restriction on political speech in a traditional public forum (the sidewalk and street outside of polling locations), the *Burson* plurality held that Tennessee would need to show that the "regulation [was] necessary to serve a compelling state interest and that it [was] narrowly drawn to achieve that end." *Id.* at 197–98 (internal quotations removed). (Justice Scalia, concurring in the judgment, concluded that, based on longstanding tradition, the sidewalk and street outside of a polling location is not a traditional public forum and that Tennessee's statute therefore did not need to pass strict scrutiny. *Id.* at 214-16.)

Tennessee maintained its electioneering law was necessary to "protect[ ] the right of its citizens to vote freely for the candidates of their choice" "in an election conducted with integrity and reliability." *Id.* at 198–99. The *Burson* plurality agreed these interests are "obviously ... compelling ones." *Id.* at 199. "Accordingly, this Court has concluded

that a State has a compelling interest in protecting voters from confusion and undue influence." *Id.*

After finding Tennessee had a compelling state interest, the Court turned to whether Tennessee's 100-foot buffer zone was necessary to vindicate these interests. "To survive strict scrutiny, however, a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Id.* After considering the history of protecting polling locations, the *Burson* plurality concluded that some restricted zone around the voting area is necessary to secure the State's compelling interest and that the only real question was how large a restricted zone is sufficiently tailored. *Id.* at 208.

To answer that question, *Burson* considered whether the Tennessee legislature's "response is reasonable and does not *significantly impinge* on constitutionally protected rights." *Id.* at 209 (emphasis added). Tennessee did not have to prove that a 100-foot boundary restriction on the First Amendment is perfectly tailored to address the competing constitutional value. *Id.* Instead, the Court's plurality opinion described the state's obligation as a "modified 'burden of proof'" because the First Amendment right threatens to interfere with the performance of the competing constitutional right, that is, the act of voting. *Id.* at 209, 209 n.11.

The modified burden was the appropriate standard, the Court plurality explained, "because a government has such a compelling interest in securing the right to vote freely and effectively." *Id.* at 208. The Court observed the inherent difficulty a state would face in attempting to produce empirical evidence to justify the precise geographic scope of its chosen buffer zone. *Id.* at 209. In the plurality's view, "a State's political system" should not have to "sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.* (internal citation and quotation marks omitted).

Applying the "modified 'burden of proof,'" the *Burson* plurality determined Tennessee's "minor geographic limitation" was not "a significant impingement." *Id.* Estimating it "takes approximately 15 seconds to walk 75 feet," the "[t]he State of Tennessee has decided that these last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible. We do not find that this is an unconstitutional choice." *Id.* at 210.

The application of *Burson* to this dispute is obvious. Members of the public have the right, under both the federal and California constitutions, to petition their elected representatives, including their elected City Council members. U.S. Constitution, First Amendment ("the right of the people … to petition the Government for a redress of grievances"); California Constitution, Article I, Section 3, subdivision (a) ("The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."). The state of California through the Brown Act (California Government Code section 54950 et seq., first passed in 1953) gives members of public the ability to exercise this right by appearing and speaking before their elected representatives at meetings of local legislative bodies (such as city councils, county boards of supervisors, and school boards). Just as Tennessee had a compelling interest in regulating the conditions that promote and safeguard the constitutional right of its citizens to vote, the Los Angeles City Council has a compelling interest in regulating the conditions that promote and safeguard the First Amendment right of the public to petition their elected representatives.

The City Council found that the N- and C-word prohibition was necessary to promote and safeguard this compelling constitutional interest because these two especially odious words make it intolerable for members of the public to attend and speak at Council meetings. The Council's findings were based on extensive written and in-person public comment, their familiarity with years of Council and Committee hearings, including the those linked at the QR code earlier in this brief, years of conferring with

their constituents, and, of course, a common sense understanding that, when a forum is laced with these two most objectionable epithets, many people will react by giving up and dropping out. (Def. Ex. A [July 29, 2025 City Attorney communication, in Council File 16-1104-S3, containing dates and time-stamps of the provided video segments. (Note that the internet locations provided in this City Attorney communication are no longer active because of changes on the City Clerk's website.)] For in-person comments by members of the public testifying to the toxifying effects of the N- and C-word, see the video segments from the following dates: 08/30/2019, 01/22/2020, 03/24/2021, 05/30/2023, 05/31/2023, 10/22/2024, 03/26/2025, and 04/29/2025.)

iii. The N- and C-word Prohibition is Not Overbroad.

"In the First Amendment context, ... a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Imperial Sovereign*, 170 F.4th at 843 (internal quotations marks and citations omitted). The Council's N- and C-word rule is perfectly tailored since it prohibits exactly the two words, inclusive of their variations, that are the source of the difficulty. The restriction and the sweep are concomitant. There is no practicable less restrictive alternative.

Following *Burson*, perfect tailoring is not required in this case, anyway. Tennessee did not have to prove that its 100-foot boundary restriction on the First Amendment was perfectly tailored because of the competing constitutional right to vote. Tennessee only needed to satisfy a "modified 'burden of proof'" showing that the restriction was not a "significant impingement" on First Amendment speech. *Id.* at 209, 209 n.11. The *Burson* court found the restriction imposed little burden because it infringed on First Amendment electioneering for only the "approximately 15 seconds" that it takes a voter "to walk 75 feet" from the sidewalk into the polling place. *Id.* at 210. Put another way, electioneers had all of the rest of the time and distance to get their point across to Tennessee voters. Such an impingement was insignificant in light of the state's safeguarding of the conditions of voting.

In this case, members of the public can use words other than the N-word and C-word. "Black" and "nasty woman" spring to mind. Granted, these words don't have the emotive force of the prohibited words. But then again, they don't toxify City Council meetings and deter members of the public from petitioning their elected representatives. The prohibition on two modes of expression is surely not a "significant impingement" on free speech in light of the other First Amendment value at stake.[3]

iv. *Cohen*, Plaintiff's Key Case, is Distinguishable and In Fact Favors the City.

At the heart of Plaintiff's argument is *Cohen*, and the free speech jurisprudence that has flowed from it. But *Cohen* is distinguishable and does not help Plaintiff's case. In fact, it supports the City's position. Defendant Cohen was in the corridor of the Los Angeles county courthouse wearing a jacket visibly bearing the words "Fuck the Draft" to express his opposition to the Vietnam War. 403 U.S. at 15. Cohen was arrested and convicted under California Penal Code section 415, which prohibited "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person . . . by . . . offensive conduct." *Id*. Cohen was sentenced to 30 days in jail. *Id*. The California Court of Appeal affirmed the conviction, and the California Supreme Court declined review.

In reversing Cohen's conviction because it found it to be a violation of his speech rights, the U.S. Supreme Court based its conclusion on several factors. First, nothing in the language of the penal statute, which was applicable throughout the state, "put [Cohen] on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places," such as a courthouse corridor. *Id*. at 19. "No fair reading of the phrase 'offensive conduct' can be said sufficiently to inform the ordinary person that distinctions between certain locations

---

[3] The prohibition does apply outside of Council and Committee meetings. And it explicitly does not prohibit members of the public from using the N- or C-word in emails or other written public comment to the Council, which, unlike with oral comment, is unlikely to deter other members of the public from participating. (Pl. Memo, Ex. B at 2 [Council motion and findings of March 21, 2025].)

are thereby created." *Id*. . Nor were the words on the jacket likely to provoke a violent reaction. *Id*. at 20. Finally, the Court noted that bystanders' confrontation with Cohen's message was de minimis and easily avoidable:

> Given the subtlety and complexity of the factors involved, if Cohen's 'speech' was otherwise entitled to constitutional protection, we do not think the fact that some unwilling 'listeners' in a public building may have been briefly exposed to it can serve to justify this breach of the peace conviction where, as here, there was no evidence that persons powerless to avoid appellant's conduct did in fact object to it, and where that portion of the statute upon which Cohen's conviction rests evinces no concern, either on its face or as construed by the California courts, with the special plight of the captive auditor, but, instead, indiscriminately sweeps within its prohibitions all 'offensive conduct' that disturbs 'any neighborhood or person.'

*Id.* at 22. The Court adds, in a phrase that has since become famous, that members of the public in the courthouse corridor could "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Id.* at 21.

Our case differs from *Cohen* in all of these factors the Court emphasized. First, the Council prohibition more than sufficiently notifies everyone that the N- and C-word are not permitted in Council and Committee meetings. Second, use of the N- and C-word does risk violent reactions. At least twice, use of the N-word would have led to fisticuffs but for intervention by the sergeants-at-arms. (Pl. Memo, Ex. B at 2 [Council motion and findings].) And, third, members of public have objected to their extensive and repeated exposure, in meeting after meeting, to the N- and C-word, as parts of the QR code-linked video and the Council file show. (Def. Ex. A [communications from the public in Council File number 16-1104-S3].)

Additionally, while "the government bears a heavy burden to show that its restriction is narrowly tailored because the burden normally falls upon the viewer to avoid further bombardment of (his) sensibilities simply by averting (his) eyes," the City

meets that burden. *Imperial Sovereign*, 170 F.4th at 865 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210–11 (1975), quoting *Cohen* at 21) (internal quotation marks omitted). Members of the public attending Council and Committee meetings cannot simply "avert their eyes," or ears. Expecting all members of the public to leave the Council or Committee chamber when a likely N- or C-word-spewing speaker approaches the podium is unrealistic. Many members of the public are not easily mobile and don't want to lose their seats when they step out of the chamber. Furthermore, members of the public waiting in line to provide their own public comment, whether in-person or remotely on the phone, need to listen to the proceedings so they know when it is their turn to speak.

The most important difference between this case and *Cohen*, however, is that *Cohen* involved a criminal sanction (Mr. Cohen was sentenced to jail), and potentially a heavy monetary penalty (up to $200 in 1968 dollars). *Cohen* at 15, 15 n.1. The Ninth Circuit, following the Supreme Court, has made clear that the potential of criminal sanctions is especially critical in a strict scrutiny analysis because criminal sanctions are unlikely to be narrowly tailored. *See*, *e.g.*, *Reno v. ACLU*, 521 U.S. 844, 872 (1997) (holding that the Communications Decency Act, a criminal statute, was not narrowly tailored and underscoring that the "increased deterrent effect" of criminal sanctions "poses greater First Amendment concerns than those implicated by ... civil regulation"; and that "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."); *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989) (rejecting as "quite unpersuasive" the argument that a criminal "ban on indecent commercial telephone communications is justified because nothing less could prevent children from gaining access to such messages"); *Imperial Sovereign* at 864 (holding that a "drag-story-hour" restriction is not narrowly tailored to the asserted governmental interest in shielding children from indecent speech because "it employs a blunt and draconian instrument to further that interest: heavy civil and criminal sanctions").

In this case, no one is subject to a potential criminal or monetary sanction of any kind for violating the Council rule. The worst thing that happens to someone who violates the N- and C-word prohibition is that the person is excluded from the remainder of the meeting she disrupted, and any Council and Committee meetings through the remainder of the next business day. This is not a criminal (or even a civil) sanction that raises the highest level of First Amendment concerns. *See FCC v. Pacifica*, 438 U.S. 726, 733-34, 750 (1978) (upholding the FCC's determination that a radio broadcast was actionably indecent "because the agency had engaged in a case-specific, contextual adjudication, and it imposed no criminal penalties").

Plaintiffs quote another now-famous passage from the *Cohen* court. While, the Court acknowledged, Cohen's four-letter word may be more distasteful than most other profanities, "it is nevertheless often true that one man's vulgarity is another's lyric." *Cohen* at 25. The language in the QR-linked video is surely no one's lyric.

A court likely would prohibit use of the N- or C-word inside his or her courtroom as disrupting and interfering with the court's proceedings. Similarly, use of these words undercuts the purpose of the public comment period at Council and Committee meetings because it deters others from public comment and so disrupts the City legislative proceedings. *See Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1133 (9th Cir. 2018) (upholding as constitutionally valid on its face a rule disallowing bus advertisements that will foreseeably disrupt or interfere with the transportation system's intended purpose of safe and reliable public transportation, and noting this functionality standard is sufficiently definite and objective to prevent arbitrary or discriminatory enforcement because the "ultimate criterion is an objective one: reasonably foreseeable harm to, disruption of, or interference with the transportation system," thus avoiding a "'standardless standard' whose application will be immune from meaningful judicial review.") (quoting *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001)) (some internal quotation marks omitted).

### B. Plaintiff is Unlikely to Succeed on the Merits Because Violating the N- and C-word Prohibition is an Actual Disruption.

Plaintiff accuses the City Council of "manufacturing" an actual disruption, in violation of Ninth Circuit precedent. Plaintiff is wrong about the precedent and wrong that there is no actual disruption. The Ninth Circuit has made clear that the touchstone for an "actual disruption" is whether a member of the public interferes with the purpose or function of a limited public forum. *White v. City of Norwalk*, 900 F.2d 1421, 1425–26, n.3 (9th Cir. 1990) (indicating that a person disrupts a city council meeting by interfering with the meeting's purpose, and stating "[t]he meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner. Indeed, such conduct may interfere with the rights of other speakers") (quoting Robert Post, Between Governance and Management: The History and Theory of the Public Forum, 34 U.C.L.A. L.Rev. 1713, 1799 (1987), that for a town meeting its "very purpose is the creation of a forum for public discourse and decisionmaking").

Granted, in *Dowd v. City of Los Angeles*, the district court found no actual disruption when a speaker dropped an F-word in his remarks, but that is because the City did not identify any disruption, and the *Dowd* court held that the speaker's profanity ("there's no guidelines for what that fucking means"), which the court characterized as an "intensifier," was protected speech in the absence of evidence that the profanity impeded the meeting. 2013 WL 4039043, at 19-20 (C.D. Cal. 2013). It did not help the City's case that the Council president, besides dismissing the speaker from the meeting, also imposed "the weighty punishment of barring him from speaking for 30 days." *Id.* at 19.

The *Dowd* court stated that the Council's rules of decorum are constitutional when there is an actual disruption "beyond a per se breach of the Rules." *Dowd* at 21. Violating the N- and C-word prohibition is more than a "per se breach" because, as the City Council found, use of the N- and C-word deters public participation and undercuts the function of the public comment period. The consequence to a speaker who uses either of

the prohibited words is that the presiding officer or staffing attorney may[4] stop the proceeding to admonish the speaker or order the speaker to leave the meeting.

### C. Excluding Disruptors From Future Meetings is Not Impermissible Prior Restraint.

When the presiding officer at Council or a Committee orders a member of the public removed for violating the N- and C-word prohibition, the officer does so because the speaker has disrupted the meeting. The Council Rules in turn provide that anyone who disrupts and is ordered removed from a Council or Committee meeting—for whatever reason—is subject to exclusion from a future meeting. (Pl. Memo. Ex. A at 3 [Council Rule 7 ("Disruptions" section)].) Plaintiff, citing *In re Nat'l Sec. Letter*, says that such exclusion cannot stand *unless* the speech restriction independently complies with the First Amendment. (Pl. Memo. at 17, emphasis added.) See *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1071 (9th Cir. 2022) ("a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license or other burden must itself pass constitutional muster," quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969), internal citations omitted).

As the City has already shown, the N- and C-word prohibition *does* comply with First Amendment free speech jurisprudence. It is a viewpoint-neutral and reasonable restriction in a limited public forum. *Rosenberger*, 515 U.S. at 829; *Kindt*, 67 F.3d at 270–71; *Walsh*, 154 F. Supp. 3d at 1128. The restriction even passes strict scrutiny (though it doesn't have to in a limited public forum) and is especially important in

---

[4] Plaintiff accuse the N- and C-word prohibition of giving the Council's presiding officer "unbridled discretion" because the rule provides only that a speaker is "subject to possible removal and exclusion." (Pl. Memo. at 15.) But the Brown Act provides that a speaker must be issued a warning before being ordered removed (Cal. Gov't Code section 54957.95), effectively giving every speaker one free disruption. The Council rule cannot, therefore, say that an offending speaker must be removed, only that he may be. Plaintiff has not claimed that any speaker has used the N- or C-word in a non-offensive manner and has been treated more favorably as a result.

situations such as this where the speech results in an abridgment of the constitutional rights of others.

**D. Plaintiff is Unlikely to Succeed on the Merits Because the Council's Rules Do Not Violate the Brown Act.**

The only remaining question is whether excluding members of the public from a future Council or Committee meeting because they disrupted the meeting and were ordered removed violates the Brown Act. No one has a First Amendment Speech right to address a legislative body. In California, that right is a creation of the Brown Act. California Government Code section 54954.3(a)(1). That same section of the Brown Act also allows a legislative body like the City Council to "adopt reasonable regulations to ensure that the intent of subdivision (a) is carried out," that is, to facilitate the opportunity of members of the public to address the legislative body, in this case, their elected Council members.

In October 2018, the Council made findings and adopted a rule to eject from a Council or Committee meeting any member of the public who disrupts that meeting. (Def. Ex B [Council motion and findings of March 21, 2025 in Council File 16-1104-S3 at "Motions and Resolutions" tab] at 1, 2 [finding that disrupting the orderly conduct of public meetings "deter[s] other members of the public from attending public meetings and taking the opportunity provided under the Brown Act to provide comment to their elected representatives"].) In order to deter disruptions, the rule provided for escalating consequences for serial disruptors. For example, a member of the public ejected from a Council or Committee meeting who then disrupts and is ordered removed from any Council or Committee meeting at any time during the following three "business" days (defined as days when Council or a Committee meets) is excluded from attending all Council and Committee meetings for the remainder of that day and the next business day. (*Id.* at 1.) The rule is not a form of punishment but an effort to prevent disruptions and increase overall public participation.

More than six years later, in August 2025, the Council made findings and amended the rule. The Council found that the initial rule had proven a partial success, with disruptive members of the public becoming more careful not to disrupt meetings within three business days of their being removed from a prior meeting. (Pl. Memo Ex. C.) Council also found that, unfortunately, the 2018 rule did not sufficiently deter "initial" disruptions that only result in a person's being excluded from the single meeting he or she disrupts. (*Id.*) Disruptors apparently viewed the consequences for initial disruptions as slight. Council therefore amended the rule to provide that "[a] member of the public who disrupts and is ordered removed from a Council meeting or a Committee meeting shall be excluded from the remainder of that meeting and excluded from attending all Council and Committee meetings for the remainder of that day and for the following business day." (*Id.*)

This rule is a perfectly reasonable and modest attempt, consistent with California Government Code section 54954.3(a)(1), to prevent actual disruptions and maintain the orderly conduct of business in order to maximize the participation of all public speakers. This Council rule does not violate the Brown Act.

### E. The Remaining *Winter* Factors Favor the City

Because there is no First Amendment free speech violation, Plaintiff has suffered no irreparable injury; and for the same reason, the balance of equities and the public interest, which merge when the government is a party, favor the City. *Imperial Sovereign*, 170 F.4th at 876.

///

///

///

## IV. CONCLUSION

The Court should deny Plaintiff's motion for a preliminary injunction.

Date: November 16, 2026

HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney
KATHLEEN KENEALY, Chief Asst. City Attorney
STREFAN FAUBLE, Assistant City Attorney

By: [signature]

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant, certifies that this memorandum contains 6,791 words, which complies with the word limit of Local Rule 11-6-1.

Dated: November 16, 2026 [signature]